## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SHAWN P. BAKER,** *Plaintiff,* <br><br> v. <br><br> **SPECIAL AGENT DANA WARD,** *Defendant.* | **Civil No. 23-1001** |

**Costello, J.**                                                                 **July 8, 2025**

## <u>MEMORANDUM</u>

Shawn P. Baker sued Special Agent Dana Ward under 42 U.S.C. § 1983 for malicious prosecution.  The underlying case arose from the investigation and prosecution of Baker for the alleged sexual assault of a female referred to here as E.C.[1]  Ward was an investigator for the Pennsylvania Office of the Attorney General and was involved in the investigation of the alleged assault.  More specifically, Ward authored an affidavit of probable cause in support of a criminal complaint charging Baker with numerous crimes related to the assault.  After a trial, Baker was found not guilty of these crimes.  In this lawsuit, Baker alleges that Ward's affidavit in support of Baker's arrest did not disclose, and affirmatively misrepresented, material facts.  Baker further alleges that if the affidavit had been accurate, there would have been no probable cause to charge him.  Defendant moved for summary judgment, arguing that there is no genuine dispute that probable cause existed to charge Baker.  As is detailed below, the Court agrees and will grant the motion for summary judgment.

---

[1]  E.C.'s full identity is known to the parties.  She and the witnesses referred to in the affidavit are referred to here by initials to protect their privacy.

I.    **FACTS**

A.    **The Probable Cause Affidavit.**

According to Ward's affidavit, on the evening of November 14, 2020, E.C. and her friend, T.L., went to a restaurant where they each had had some mixed drinks and beers.  Aff. of Prob. Cause, ECF No. 29-9 at 6-8.[2]  T.L. received a call from Baker inviting her to come to his house.  *Id.* at 6.  E.C. and T.L. went to Baker's house, and while there, E.C. drank some beer.  *Id.*  Prior to the alleged sexual assault, E.C., T.L., and Baker picked up T.L.'s daughter, M.S., and brought her to Baker's house.  *Id.*  M.S. did not drink alcohol that evening.  *Id.*  When the group returned to Baker's house, he offered to grill some food and asked for E.C.'s help.  *Id.*  When E.C. went outside to help Baker, her hair was up in a ponytail, in a black hair tie, and she was wearing a buttoned blouse.  *Id.*  Once outside, Baker grabbed E.C., yanked her hair by her ponytail, and physically forced E.C. into a sexual encounter with him.  *Id.*  E.C. stated that the alleged sexual assault happened quickly.  *Id.*

During the investigation E.C. gave Ward the buttoned blouse she wore on November 14th.  *Id.* at 7.  The shirt was missing three buttons which E.C. claimed were ripped off during the assault.  *Id.* at 6-7.  E.C.'s black hair tie was also missing.  *Id.* at 7.  Ward searched Baker's house and found two of the missing buttons from E.C.'s blouse.  *Id.*  Ward did not find E.C.'s black hair tie.  *Id.*  During the search, Ward interviewed Baker.  *Id.* at 7-8.  Ward reported that Baker confirmed that E.C.'s hair was in a ponytail during the encounter.  *Id.*

B.    **Inconsistencies Between the Investigation and the Probable Cause Affidavit**

The affidavit's version of events somewhat differs with the facts developed by Ward's

---

[2]  The affidavit docketed at ECF No. 29-9 is the affidavit of probable cause supporting the criminal complaint filed against Baker.  Def.'s Stmt. of Add'l Facts, ECF No. 29-2 ¶¶ 19-20; Pl.'s Resp. to Def.'s Stmt. of Add'l Facts, ECF No. 33-4 (no response to these paragraphs).

investigation. For instance, E.C. told police that she had two shots at the restaurant rather than two mixed drinks. Joint Stip. of Mat. Facts, ECF No. 29-1 ¶ 5. E.C. also told Ward that in addition to the beer she had at Baker's house, she also had two double shots of whiskey. *Id.* ¶ 44. In addition, Ward failed to mention in the affidavit that T.L., E.C.'s friend who was present at Baker's residence, told Ward that she blacked out from her drinking and did not recall many of the events of that night. *See* Aff. of Prob. Cause, ECF No. 29-9 at 6-8; Pl.'s Resp. to Def.'s Stmt. of Add'l Facts, ECF No. 33-5 ¶ 6; Ward's Dep., ECF No. 29-5 at 67:4-8. Also, in contrast to E.C.'s statement that the assault happened quickly, M.S., T.L.'s daughter, told Ward that Baker and E.C. were alone for ten to fifteen minutes. Joint Stip. of Mat. Facts, ECF No. 29-1 ¶ 58. Finally, during his interview, Baker told Ward that E.C.'s hair was down at her shoulders and not in a ponytail as the affidavit stated. *Id.* ¶ 69.

Additional information not included in the affidavit was the fact that E.C. found the black hair tie in the pocket of a jacket she was wearing the night of the alleged assault. Pl.'s Stmt. of Mat. Facts, ECF No. 33-4 ¶ 40. E.C. found the hair tie on the day Ward's affidavit was filed. *Id.*

### C.    Procedural History

Based on Ward's affidavit, Baker was charged with one count of involuntary deviate sexual intercourse, one count of sexual assault, two counts of aggravated indecent assault, two counts of indecent assault, and one count of false imprisonment. Joint Stip. of Mat. Facts, ECF No. 29-1 ¶ 87. On April 21, 2021, a preliminary hearing was held. *Id.* ¶ 89. During the preliminary hearing, E.C. acknowledged that she was unsure whether her hair was up or down during the alleged sexual assault. Prelim. Hr'g Tr., ECF No. 29-8 at 29:15-19. E.C. also acknowledged that she believed that she had two shots of whiskey while at Baker's house. *Id.* at 20:10-25. Upon the conclusion of the preliminary hearing, the magisterial district judge found

that probable cause existed for the charges and the case proceeded to trial.  Joint Stip. of Mat.

Facts, ECF No. 29-1 ¶¶ 89, 91.  After the trial, Baker was found not guilty.  *Id.* ¶¶ 92-93.  Baker

then filed this complaint against Ward asserting malicious prosecution claims under both state[3]

and federal law.  Compl., ECF No. 1.  The case proceeded through discovery and Ward now

moves for summary judgment.  Def.'s Mot., ECF No. 29.

## II.    LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is

material when its determination "might affect the outcome of the suit under the governing law."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of fact is genuine if a jury

could rationally find in favor of the non-moving party.  *Id.*  The moving party has the initial

burden of demonstrating the lack of a genuine dispute of material fact.  Fed. R. Civ. P. 56(a).

Once this burden is satisfied, the non-moving party must counter with "specific facts showing

that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986) (citation omitted).  In making this determination, the Court views the facts

and all reasonable inferences in favor of the party opposing the motion.  *Popa v. Harriet Carter

Gifts, Inc.*, 52 F.4th 121, 125 (3d Cir. 2022).  Disagreements over what reasonable inferences

may be drawn from undisputed facts preclude summary judgment.  *Ideal Dairy Farms, Inc. v.

John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996).  The Court's role at the summary judgment

---

[3] Baker has consented to the dismissal of his state law malicious prosecution claim.  *See* Pl.'s
Opp., ECF No. 33 at 17 n.3.  Ward's motion as to Baker's state law claims will be granted for the
reasons stated in Defendant's brief.  Def.'s Br., ECF No. 29 at 13-14.

stage is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.

### B.    Malicious Prosecution and Probable Cause

Section 1983 is employed to vindicate constitutional rights.  *Chiaverini v. City of Napoleon, Ohio*, 602 U.S. 556, 561 (2024).  Malicious prosecution claims seek to redress unreasonable seizures that result from the state's prosecution of a person without probable cause. *Id.* at 558.  To succeed on this claim, Baker must prove that: 1) Ward initiated a criminal proceeding; 2) the proceeding ended in Baker's favor; 3) the proceeding was initiated without probable cause; 4) Ward acted maliciously or for a purpose other than bringing Baker to justice; and 5) Baker suffered a deprivation of liberty consistent with the concept of a seizure as a consequence of the proceeding.  *Andrews v. Scuilli*, 853 F.3d 690, 697 (3d Cir. 2017).  Probable cause in a malicious prosecution case must be evaluated "charge by charge."  *Chiaverini*, 602 U.S. at 562.

Probable cause "is not a high bar."  *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018).  It exists where there is a "'fair probability' that the person committed the crime at issue."  *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 467 (3d Cir. 2016) (citation omitted).  When "the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been … committed by the person…" probable cause exists.  *Id.* (citation omitted).  This bar is "significantly lower than the standard which is required for conviction."  *Wright v. City of Phila.*, 409 F.3d 595, 602 (3d Cir. 2005).  Because probable cause only requires a "fair probability" that a crime occurred, Courts need not "identify 'the same type of specific evidence of each element of [an] offense as would be needed to support a conviction.'"  *Dempsey*, 834 F.3d at 477 (citation omitted).

Probable cause can exist even where there is conflicting or irreconcilable evidence. *Id.* at 468. Officers need not "correctly resolve conflicting evidence" nor accurately determine the credibility of witnesses. *Id.* at 467 (citation omitted). Despite this, officers cannot "disregard plainly exculpatory evidence" even where there is "substantial inculpatory evidence" that "suggests probable cause exists." *Id.* at 469. At the summary judgment stage, probable cause must be assessed "based upon the 'totality-of-the-circumstances' available to the arresting officer … view[ing] those circumstances in the light most favorable" to the plaintiff. *Harvard v. Cesnalis*, 973 F.3d 190, 200 (3d Cir. 2020) (quoting *Dempsey*, 834 F.3d at 467-68). Probable cause is ordinarily a question of fact in a malicious prosecution case. *Dempsey*, 834 F.3d at 468. However, "summary judgment may be granted on the question of probable cause if a court concludes that 'the evidence, viewed most favorably to [the nonmoving party], reasonably would not support a contrary factual finding.'" *Id.* (citation omitted).

### C.     Retrospective Challenges to a Judicially Approved Probable Cause Affidavit

Once a judge approves a probable cause affidavit, Courts normally defer to the warrant-issuing judge's determination unless it can be shown that "the officer misrepresented material information to get the warrant." *Pinkney v. Meadville, Pennsylvania*, 95 F.4th 743, 748 (3d Cir. 2024). An officer misrepresents material information when it can be shown that "first, … the officer, with at least a reckless disregard for the truth, 'made false statements or omissions that create[d] a falsehood in applying for a warrant,' and second, that those assertions or omissions were 'material, or necessary, to the finding of probable cause.'" *Dempsey*, 834 F.3d at 468-69 (citation omitted).

If the officer made reckless assertions or omissions, the Court must reconstruct the affidavit, word-by-word, so that it can proceed with a materiality analysis. *Id.* at 470, 474.

Material information is information asserted or omitted that was "necessary … to the finding of probable cause." *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000) (citation omitted).  For the court to grant summary judgment on probable cause, it must conclude that "no reasonable jury could find facts that would lead to the conclusion" that the reconstructed affidavit lacked probable cause. *Id.* at 792.

## III.     DISCUSSION

### A.     Reconstructing the Affidavit

The first issue to consider is whether Ward made false statements or omissions that created a falsehood in applying for the warrant in this case.  As noted above, Ward did not convey in the affidavit the accurate amount of alcohol E.C. consumed.  Ward stated that E.C. had a couple of beers and a couple of mixed drinks at the restaurant.  Aff. of Probable Cause, ECF No. 29-9 at 6.  He further stated that E.C. "did not drink any liquor" at Baker's house. *Id.* However, E.C. told Ward that she had a couple of shots of liquor at the restaurant and had two double shots of whiskey at Baker's house.  Because Ward had information that contradicted the assertions he made in the probable cause affidavit, a reasonable juror could find that Ward had reason to doubt the accuracy of his statements regarding E.C.'s alcohol consumption.

Next, Ward omitted from the affidavit details about T.L.'s intoxication that impacted her competence as a witness.  A reasonable juror could find that Ward knew that T.L. was intoxicated on the evening in question because T.L. said so during her interview.  Although T.L. did not witness the alleged assault, she was present at the restaurant, Baker's house, and E.C.'s

7

house that night.  Her questionable competence as a witness to the factual circumstances

surrounding the alleged assault could conceivably impact the probable cause analysis.[4]

A further discrepancy involves the length of time Baker and E.C. were alone, during

which time E.C. claims the assault occurred.  E.C. claimed that the encounter happened quickly

while M.S. claimed that E.C. and Baker were alone for ten to fifteen minutes.  M.S. provided this

information to Ward in her statement.  This discrepancy could impact the probable cause

analysis.  *See Dempsey*, 834 F.3d at 473 (additional information regarding length of time parties

were alone in sex crime investigation was relevant to probable cause).

The final discrepancy concerns whether E.C. had her hair in a ponytail during the alleged

assault.  According to the affidavit, Baker grabbed E.C. by her ponytail.  The probable cause

affidavit stated that Baker confirmed that E.C.'s hair was in a ponytail that night.  Aff. of Prob.

Cause, ECF. No. 29-9 at 7.  That was incorrect.  In fact, Baker told Ward that E.C.'s hair was

down around her shoulders.  Joint Stip. of Mat. Facts, ECF No. 29-1 ¶ 69.

Based on these discrepancies, there can be no doubt that the affidavit included some

errors, and that relevant information was omitted.  Therefore, the Court will reconstruct the

affidavit.  The reconstructed affidavit reads as follows:

> …3. On 11/14/2020, Victim E.C. was at The Sandwich Factory,
> Lancaster County, PA, with her friend, Witness T.L. age 38.  They
> each had a couple beers, a couple ~~mixed drinks~~ **[shots of liquor]**
> and ate some food.  Witness T.L. received a call from defendant
> Shawn P. Baker, age 52.  Witness T.L. was borrowing an item from
> Baker and he advised that she could come by his residence and
> pick the item up.  Baker's residence is 1950 State St. East

---

[4]  Baker's reconstruction of this section, that T.L. "had no recollection" of the rest of the evening, is not supported by the factual record.  *See* Pl.'s Opp., ECF No. 33 at 10.  Per Ward's investigative report, T.L. did recall certain events that occurred after the group picked up M.S., including that E.C. told T.L. and M.S. that Baker tried to undo her pants.  Joint Stip. of Mat. Facts, ECF No. 29-1 ¶¶ 38, 54; Ward's Investigative Report, ECF No. 29-4 at 4; Ward's Dep., ECF No. 29-5 at 71:7-72:8.

Petersburg, PA 17520.  Witness T.L. Invited Victim E.C. to come along.  They purchased a six pack of beer to take with them.  Victim E.C. followed Witness T.L. to Baker's in her vehicle.  Victim E.C. had never met Baker before, had never spoken to him and had never been to his residence.

4.  At Baker's residence, Victim E.C. met Baker for the first time.  Victim E.C. had a couple of the beers that they had brought with them.  Witness T.L. also had a couple beers and began drinking liquor with Baker.  Victim E.C. ~~did not drink any liquor~~ **[consumed two double shots of whiskey, or the equivalent of four individual shots]**.  After a period of time, Witness T.L. received a phone call from her daughter, Witness M.S. age 19, who advised she needed to be picked up.  Baker, Victim E.C. and Witness T.L. drove in Baker's car to pick up Witness M.S. and the four of them returned to Baker's residence.  **[Witness T.L. stated that she "blacked out" from alcohol consumption while at Baker's home and could not recall much of the events after they picked up M.S.]**  Witness M.S. did not drink alcohol the entire evening.  Up to this point in the evening, Victim E.C. reported that there was no flirting, no gestures or sexual innuendos between her and Baker.  She described them as having "casual conversations."

5.  As the four of them visited, they had snacks of chips and salsa and popcorn.  They all became hungry and Baker said he would grill some ham steaks on his grill, everyone agreed.  At this point in the evening Victim E.C. had her long brown hair in a ponytail hair style with the ponytail being held by a black hair tie.  She had on a bra, tank top style t-shirt over her bra and a striped blouse with three quarter length sleeves, buttons up the front and a collar over the tank top.  She was wearing underwear, pants that buttoned and zippered in the front and shoes.  Baker asked Victim E.C. if she would help him with the steaks and she agreed.  She followed Baker through a couple rooms, out a back door to the rear outdoor back porch area where the grill was located.

6.  Upon stepping out on the back porch, Baker immediately grabbed Victim E.C. by her ponytail, pulling hard and hurting her scalp.  Victim E.C. reported that it happened so fast she had no time to react.  Baker pushed her back up against the wall of the house by the back porch door.  Baker said something to Victim E.C. about being "her daddy."  Baker ripped open her blouse, lifted up her bra and exposed her breasts.  He licked and sucked on her breasts while pinning her to the wall.  His hands had dropped and quickly unbuttoned her pants and he pulled them down to her mid-

thigh area.  Victim E.C. said she was in "shock" and "it happened
so fast" and she was thinking "Oh my God, what is happening."
Baker bent over and licked the front of her vagina with his tongue.
He penetrated her vagina with his fingers and then took the same
fingers and shoved them into Victim E.C.'s mouth.  He then
shoved her in the direction of the grill and said something like,
"Get your fucking ham steaks."

Victim E.C. pulled up her pants and was wondering what just
happened.  She took a ham steak and returned to the house via the
kitchen door off the back porch, not the same door where she
entered the porch from.  She immediately became upset and
emotional.  Victim E.C. walked through the kitchen into the living
room where Witnesses T.L. and M.S. were sitting.  **[Witness M.S.
reported that Victim E.C. and Baker were alone together for
ten to fifteen minutes.]**  Victim E.C. looked at Witness M.S. and
quietly "mouthed," "We have to go."  Victim E.C. put down her
plate, retrieved her car keys and left via the back kitchen door that
she had just entered.  As she was leaving, Baker asked her "what
her fucking problem was."  She got into her car but didn't leave
right away.  She did not want to leave Witnesses T.L. and M.S. in
the residence with Baker.  Victim E.C. reported that she did not
consent, in any way, to Baker's sexual contact.

7.  Victim E.C. sent a text message to Witness M.S. to get Witness
T.L. and leave the house.  Witness M.S. came outside and Victim
E.C. told her what happened.  Witness M.S. texted Witness T.L. to
leave the house.  After a few minutes, Witness M.S. was able to get
her mother Witness T.L. out of the house and they all went to
Victim E.C.'s home, where Victim E.C. told them in detail what
had occurred.  At this point in the evening, phone records show
that it was past midnight and 11/15/2020.  Victim E.C., in the early
morning hours, tried to call a County Detective friend of hers to
seek guidance and tell her what happened.  The detective did not
answer her phone.  Victim E.C. was crying and emotional when
she placed the call.

8.  The next day, Victim E.C. reported the incident to a prosecutor
friend who advised her that she should call a female Detective and
Victim E.C. could make a report.  Victim E.C. agreed and a police
report was taken.  During the report, Victim E.C. stated that her
hair tie was missing and three buttons from her blouse were ripped
off during the incident.

9.  On 11/18/2020, Victim E.C. and Witness T.L. and M.S.
provided recorded interviews and detailed statements about the

incident. Victim E.C. provided her striped blouse which showed that three buttons were missing. She also described her hair tie as like the one she wore for this interview. Later on this date, a Search Warrant was executed at Baker's residence to search for three missing buttons and the hair tie. Two buttons were found but the hair tie and third button was not located. During the Search Warrant and after being verbally Mirandized, Baker waived his Miranda rights and asked if he could tell me what happened. Baker's entire statement was video and audio recorded on an officer's body camera system.

10. At first Baker said he knew nothing about the buttons. Then he changed his statement and said he found it where she was sitting on the floor. He said he threw the button away in the kitchen trash. (A button was found in the kitchen trash.) Then he changed his statement again and said that he found a second button in the living room and also threw it away. (A second button was found in the living room behind the TV stand on the floor.) When asked to explain the button found on the floor, Baker explained that he thought he threw both buttons away but must have placed one of the buttons on the TV stand and then when he moved the TV, the button must have fallen onto the floor.

11. As for the sexual contact, Baker said that Victim E.C. had been flirting with him all night long. He said she did **[not]** have her hair in a ponytail. She followed him outside when he went out to grill the ham steaks. Before stepping outside, Baker said he was standing in the back room and Victim E.C. was standing in the doorway to another room. Victim E.C. was in a doorway that was a step above Baker, so as he stood, his face was about breast level to Victim E.C. Baker said that Victim E.C. started to kiss him and then she ripped open her own shirt exposing her breasts. He said he did lick and suck on her breasts while she was unbuttoning and pulling down her pants and underwear exposing her vagina. Baker said he turned her around so she was facing away from him and she bent over at the waist. Baker said he licked and penetrated the rear of her vagina and her anus with his tongue. He said he put his fingers in her vagina and she had an orgasm in forty (40) seconds.

12. He said the incident stopped because he told her that Witnesses T.L. and M.S. were in the next room and they had to stop. Baker said Victim E.C. initiated all the sexual contact and it was him who had to stop her from continuing. Baker described the incident as "hot" and "intense." Baker said he returned to the living room and Victim E.C. took a ham steak off the grill.

13.  Baker said he was in the living room and could see Victim
E.C. enter through the kitchen door.  He said Victim E.C. looked
upset and emotional.  Baker said he assumed that E.C. had a
boyfriend and was upset because she had just cheated on him.
Baker said that Victim E.C. did not enter the living room but got
her keys and left through the kitchen.  Baker said later, both
Witnesses T.L. and M.S. left his house without explaining what
was going on.  Baker said he didn't understand why they left.

14.  Phone evidence obtained showed that Victim E.C. did text
Witness M.S. and was attempting to get them out of the house.
The voice mail where Victim E.C. called the County Detective was
obtained and Victim E.C. was upset and emotional.  The buttons on
Victim E.C.'s blouse had a slight pearl color to them.  The buttons
found during the Search Warrant matched the color of the buttons
on the blouse.  The threads that were holding the found buttons
appear to be pulled and jagged rather than cut neatly and even.
Both Witnesses T.L. and M.S. reported that they did not witness
Victim E.C. flirting In any way with Baker....

## B.    The Materiality Analysis

Having reconstructed the affidavit, the next issue for the Court to consider is whether

Ward's inaccurate assertions or omissions were material, or necessary, to the finding of probable

cause.  To establish probable cause for the crimes charged, Ward had to factually establish a fair

probability that Baker compelled E.C., through physical force, to engage in oral sexual

intercourse, to digitally penetrate her, to grope and lick her breast, and that Baker restrained E.C.

and substantially interfered with her ability to leave. 18 Pa. C.S. §§ 3101, 3123, 3124.1,

3125(a)(2), 3126(a)(2), 2903.  The reconstructed affidavit factually establishes a fair probability

that Baker committed the crimes with which he was charged.

E.C. provided sufficient information to investigators to establish these elements.  A

statement from a victim witness, by itself, usually establishes probable cause "in the absence of

'[i]ndependent exculpatory evidence or substantial evidence of [a] witness's own unreliability'

that 'outweigh[s]' the probable cause that otherwise exists."  *Dempsey*, 834 F.3d at 477-78

(citation omitted). "[S]ome 'unreliability or exculpatory evidence' will not 'fatally undermine[ ]' probable cause otherwise established." *Id.* at 478 (citation omitted).

Ward's underrepresentation of E.C.'s alcohol consumption does not defeat probable cause. Undoubtedly, Ward had additional information regarding E.C.'s alcohol consumption that he did not disclose in the affidavit. But Ward also had evidence that corroborated E.C.'s account. Specifically, Ward's search of Baker's house discovered two of the three missing buttons from E.C.'s blouse. Ward also had the statements of T.L., M.S., and Baker that corroborated parts of E.C.'s account. The underrepresentation of E.C.'s alcohol consumption is not the kind of substantial evidence of unreliability that would obviate the probable cause her statement provided. *See Baynard v. Sapienza*, Civ. No. 20-7723, 2022 WL 2093186, at *6-8 (D.N.J. June 10, 2022) (complainant being under the influence of opioids during crime and during statement to police reduced complainant's reliability but did not obviate probable cause).

T.L.'s state of intoxication was also not material to the probable cause finding. Here, M.S., a sober witness, was present for the same events. In addition, T.L.'s memory was not entirely compromised. She recalled certain events after she left Baker's house, specifically E.C.'s initial disclosure of the incident to both M.S. and her. Therefore, T.L.'s state of intoxication at the exact time of the alleged assault has no bearing on the probable cause finding.

Likewise, the discrepancy involving the length of time Baker and E.C. were alone, during which time E.C. claims the assault occurred, is not material to a probable cause finding. E.C. claimed that the encounter happened quickly while M.S. claimed that E.C. and Baker were alone for ten to fifteen minutes. These two statements are not obviously contradictory. Both statements could be true. Being alone together for up to fifteen minutes does not at all suggest that the alleged assault did not happen quickly from E.C.'s perspective. Thus, the discrepancy

does not cast serious doubt on E.C.'s version of events for purposes of determining probable cause. *See Dempsey*, 834 F.3d at 480-81 (time difference of incident occurring over the course of a minute versus ten minutes was not material to probable cause finding).

Finally, Baker's statement that E.C.'s hair was not in a ponytail is not material to finding probable cause. E.C.'s hair being down, rather than up in a ponytail, differed from her statement that Baker yanked her hair by her ponytail. Probable cause, however, definitionally allows for the existence of conflicting evidence. *See Tarr v. City of Pittsburgh*, 800 F. App'x 131, 135 (3d Cir. 2020) (conflicting accounts regarding how a person's head was hit in assault case was not material to probable cause finding). E.C.'s hair being up or down, while an inconsistency, does not directly contradict her version of events, *i.e.*, that Baker grabbed and yanked her hair during the alleged sexual assault.

Considering the reconstructed affidavit as a whole, there is no question that probable cause existed for Baker's arrest. No reasonable juror could find that either the Court's reconstructed affidavit or, for that matter, Baker's proposed reconstructed affidavit does not establish a fair probability that the charged crimes occurred. *See Dempsey*, 834 F.3d at 467; *Chiaverini*, 602 U.S. at 558.[5] The discrepancies that Baker identified are simply not sufficient to obviate probable cause. They do not rise to the level of independent exculpatory evidence or substantial evidence of witness unreliability necessary to question probable cause. At best, those discrepancies could—and perhaps did—create reasonable doubt at trial. That is not the standard

---

[5] The reconstructed affidavits also demonstrate probable cause for false imprisonment. Viewing the facts in Baker's favor, Ward made the decision to charge Baker with false imprisonment. The affidavits establish a fair probability that Baker, through allegedly grabbing and pulling E.C.'s hair and pinning her against a wall "substantially" interfered with E.C.'s ability to leave. 18 Pa. C.S. § 2903(a).

here. *Zimmerman v. Corbett*, 873 F.3d 414, 419 (3d Cir. 2017). As noted above, probable cause is not a high bar. Under the circumstances presented here, no reasonable jury could find facts that would lead to the conclusion that the reconstructed affidavit lacked probable cause.

It is also worth noting that the "independent judicial determination" of probable cause that occurred at the preliminary hearing in the underlying case further substantiates that probable cause existed for Baker's arrest. *See Fisher v. Matthews*, 792 F. Supp. 2d 745, 780-81 (M.D. Pa. 2011). The judge at the preliminary hearing had the benefit of additional information regarding E.C.'s alcohol consumption and the uncertainty as to whether E.C.'s hair was up or down at the time of the alleged sexual assault. Prelim. Hr'g Tr., ECF No. 29-8 at 20:10-15, 29:15-19. Despite this additional information, the magisterial district judge found that probable cause existed to advance all charges to trial. Joint Stip. of Mat. Facts, ECF No. 29-1 ¶ 91.

Because there is no genuine dispute of material fact that probable cause existed for Baker's arrest, the Court will grant Defendant's summary judgment motion.[6] An appropriate order follows.

BY THE COURT:

MARY KAY COSTELLO, J.

---

[6] Ward is also entitled to qualified immunity. Qualified immunity asks whether a Defendant violated a constitutional right that was clearly established. *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009). If the Court finds no constitutional violation, the inquiry stops, and immunity has been established. *Id.* at 236. Because Ward did not violate Baker's constitutional rights as explained above, Ward is entitled to qualified immunity.